UNITED STATES DISTRICT COURT

DISCTRICT OF MAINE

| | | |
|---|---|---|
| BTL INDUSTRIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:23-cv-00032-SDN |
| | ) | |
| REJUVA FRESH LLC and | ) | |
| POLLY JACOBS, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON MOTION FOR PRELIMINARY INJUNCTION AND MOTION TO STRIKE

In this action, BTL Industries, Inc. ("BTL") brings intellectual property claims against Rejuva Fresh LLC and its sole owner Polly Jacobs (collectively "Rejuva"). BTL's technology relates to noninvasive body-contouring devices, and BTL uses and markets its products in the United States aesthetics industry. BTL now seeks a preliminary injunction to enjoin Rejuva from importing and selling the EMSCULPT aesthetic body contouring device—and the technology used in the device—in the United States (ECF No. 100). BTL also moves to strike portions of Rejuva's opposition brief to BTL's preliminary injunction motion (ECF No. 109). For the reasons below, the motions are denied.

## PROCEDURAL HISTORY

BTL filed its initial complaint in January 2023 (ECF No. 1). Rejuva moved to dismiss the complaint (ECF No. 19), and BTL moved for partial entry of default judgment in April 2023 (ECF No. 22). In June 2023, the Court adopted the Magistrate Judge's report and recommendation in its entirety, denying BTL's motion for default judgment (ECF No. 32). The Court subsequently denied Rejuva's motion to dismiss in October 2023

(ECF No. 38).

Both parties filed their initial claim construction briefs on March 8, 2024 (ECF Nos. 57, 58). On October 1, 2024, BTL filed this motion for a preliminary injunction (ECF No. 100), seeking to enjoin the U.S. commercialization and infringement of the EMSCULPT device and any of BTL's related trademarks until final resolution of this matter. On November 5, 2024, BTL moved to strike portions of Rejuva and Ms. Jacobs's response to the preliminary injunction motion (ECF No. 109).

## BACKGROUND

### A. Overview of the Patented Technology

BTL develops and sells equipment and treatments for the aesthetics industry in the United States. BTL has developed proprietary technology that uses high-intensity electromagnetic stimulation to tone and strengthen muscles in targeted areas on the human body. BTL refers to its technology as a "body contouring" device. BTL applied its technology to produce a series of FDA-cleared devices and developed protocols for using the technology for aesthetic therapies.

BTL's first body-contouring device was the EMSCULPT device, which is a standalone, non-invasive, aesthetic body-contouring device that uses high-intensity electromagnetic energy to induce powerful muscle contractions in a patient. BTL subsequently developed EMSCULPT applicators to target different areas on the body.

In 2018, after the FDA approved the EMSCULPT device with large applicators, BTL began selling the device in the United States for the improvement of abdominal tone, strengthening of the abdominal muscles, development of a firmer abdomen, and for strengthening, toning, and firming of the lower body. The FDA approved the EMSCULPT

2

device with both large and small applicators in the following year. The smaller applicators are intended for smaller treatment areas.

BTL markets and distributes the EMSCULPT device to healthcare professionals in the United States, and BLT licenses these healthcare professionals to provide the associated treatment services using authentic EMSCULPT devices that incorporate BTL's proprietary technology, muscle toning protocols, and applicators.

BTL claims the ESCULPT device was the first of its kind and created a new market for high-intensity, focused electromagnetic technology to tone and firm muscle for non-invasive aesthetic body contouring. BTL distinguishes its technology from prior devices in the aesthetics market that use different technology to reduce fat or treat cellulite.

BTL holds five patents (the "Asserted Patents") relating to its EMSCULPT body contouring device, (ECF No. 93 at 7–8). The relevant patents are as follows:

1) U.S. Patent No. 9,636,519 (the "'519 patent") issued on May 2, 2017;

2) U.S. Patent No. 10,478,634 (the "'634 patent") issued on November 19, 2019;

3) U.S. Patent No. 10,596,386 (the "'386 patent") issued on March 24, 2020;

4) U.S. Patent No. 10,695,575 (the "'575 patent") issued on June 30, 2020;

5) U.S. Patent No. 11,266,852 (the "'852 patent") issued on March 8, 2022.

## B. Overview of BTL's Trademarks

BTL uses and licenses multiple federally registered trademarks to denote its aesthetic equipment and treatments in the United States. The relevant trademarks in this matter are BTL's HIFEM, EM-1, EM-2, EMSCULPT-1, EMSCULPT-2, and EMSCULPT NEO marks (the "BTL trademarks"), all of which BTL claims it began using in commerce

between 2017 and 2020. According to BTL, its trademarks are used not only to signify BTL produces the equipment but also to assure consumers that the body-contouring services are rendered by service providers that BTL has trained and authorized to use such equipment. ECF No. 93, ¶ 27.

The BTL trademarks present as follows:

# HIFEM

# EM

# **EM**

# **EMSCULPT**

# EMSCULPT

# EMSCULPT NEO

Aside from the EM-2 mark (the third mark on the list above), BTL's registered marks consist of standard characters without claim to any particular font style, size, or color. *See* ECF No. 16-9. The EM-2 mark is classified as an illustration drawing with letters in stylized form. *Id*.

## C. Rejuva

Rejuva is a Maine corporation that also markets and sells non-invasive body contouring devices. Pl.'s Motion for Preliminary Injunction, (ECF No. 100 at 4). Rejuva

operates as a drop-shipping business through the online platform, Shopify.com. ECF No. 100-1 at 15–19. As a drop-shipping business, to purchase Rejuva products, customers place their orders directly to Rejuva on the Shopify website; independent contractors and suppliers in China and the Philippines then process and fulfill the orders on behalf of Rejuva. ECF No. 100-1 at 66–67. The owner of Rejuva, Polly Jacobs, is a U.S. citizen living in Thailand. ECF No. 105-1, ¶ 5; ECF No. 100-1 at 69–70.

### D. Allegedly Infringing Conduct

BTL alleges Rejuva began selling products[1] (the "Accused Devices") that use the same technology to generate muscle contractions as BTL's patented devices. ECF No. 93, ¶ 28. BTL claims Rejuva markets these devices with identical or nearly identical language, photographs, videos, and manuals that BTL uses for its patented technology. *Id.* ¶ 29.

BTL also claims Rejuva uses the BTL trademarks and confusingly similar variations to promote the Accused Devices to consumers. *Id.* ¶ 33. For example, BTL claims Rejuva's webpage for the Professional Body Sculpture EMSLIM NEO Machine contains a photo showing the mark "EMSCULPTING" on the body of the device. *Id.*

BTL sent Rejuva a letter on July 14, 2022, in an attempt to stop the allegedly infringing acts. ECF No. 100-1 at 79:16–80:9. The letter contained a link to BTL's patent registrations. *Id.* at 80:17–22. Rejuva admitted it did not investigate the BTL registrations

---

[1] BTL alleges Rejuva markets and sells the Personal EMSZERO NEO Sculpting Machine, the Professional EMSZERO Neo Body Sculpting Machine, the EMZERO NEO Body Contouring Machine, the Professional Body Sculpture EMSLIM NEO Machine, the Mini EMSLIM NEO Body Sculpting Machine, the EMSLIM NEO for Home Use, the EMSLIM Body Sculpting Machine, the Mini EMSLIM Body Sculpting Machine, the Portable EMSZERO NEO Body Contouring Machine, the Personal EMS Sculpting Machine, the EMShape Neo Plus Body Sculpt Machine 5 in 1, the Professional EMShape Neo Body Sculpt Machine 5 in 1, the Diamond Ice Cryo + EMShape Body Sculpting Machine, the Professional PERFECT SHAPE NEO Body Sculpting Machine 5 in 1, the Personal EMShape Neo Elite with Upgraded Higher Power, the EMShape Neo Elite with Upgraded Higher Power, the Personal EMShape Neo Sculpting Machine, and the EMShape Neo Fit Body Sculpting Machine. ECF No. 93, ¶ 28.

after receiving the letter and continued selling the allegedly infringing technology to its customers. *Id.* at 81:22–25. In addition, after the July 2022 letter and filing of this lawsuit, Rejuva allegedly began selling additional devices that BTL claims infringe on its patented technology. *Id.* at 82–83. BTL brought this suit as a result of Rejuva's alleged noncompliance with BTL's requests, seeking damages for the alleged infringement of BTL's patented technology and trademarks and a permanent injunction to prevent Rejuva from further infringement. *See* ECF No. 93.

## DISCUSSION

### I. Motion to Strike

BTL moves to strike portions of Rejuva's opposition brief and evidence, arguing under Federal Rules of Civil Procedure 16 and 26, and 35 U.S.C. § 282, that Rejuva's attachment of an expert declaration ("Brennan Declaration") and U.S. Patent No. 7,744,523 ("Epstein Patent" or "Epstein invention") as prior art evidence of the '519 patent was untimely. *See* Plaintiff's Motion to Strike, (ECF No. 109).

I have wide discretion to allow additional evidence at the preliminary injunction stage. *See, e.g.*, *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 26 (1st Cir. 1986); *Westernbank P.R. v. Kachkar*, Civil No. 07-1606, 2009 WL 2871160, at *22 (D.P.R. Sept. 1, 2009) ("[T]he Rules of Evidence do not strictly apply to preliminary injunction submissions."); *Range of Motion Prods. LLC v. Armaid Co. Inc.*, No. 21-cv-00105, 2021 WL 3476607 at *1 n.1 (D. Me. Aug. 6, 2021) ("Affidavits . . . are often received in preliminary injunction proceedings." (quoting *Asseo*, 805 F.2d at 26)). Contrary to BTL's assertions, allowing Rejuva to include this evidence will not prejudice BTL: expert discovery is ongoing in this matter, the Court has allowed the parties to submit additional claim construction briefs,

and the *Markman* hearing has yet to occur. *See* ECF Nos. 117, 140, 143, 150. Accordingly, I deny BTL's motion to strike and allow the evidence.

## II. Preliminary Injunction

"To grant a preliminary injunction, a district court must find the following four elements satisfied: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent interim relief, (3) a balance of equities in the plaintiff's favor, and (4) service of the public interest." *Arborjet*, *Inc. v. Rainbow Treecare Sci. Advancements*, *Inc.*, 794 F.3d 168, 171 (1st Cir. 2015); *accord Takeda Pharm. U.S.A., Inc. v. West-Ward Pharm. Corp.*, 785 F.3d 625, 629 (Fed. Cir. 2015). As the party seeking injunctive relief, BTL bears the burden of establishing that the factors weigh in its favor. *Esso Standard Oil Co. (P.R.) v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006); *see also Hybritech Inc. v. Abbott Lab'ys*, 849 F.2d 1446, 1451 n.12 (Fed. Cir. 1988) ("[P]urely procedural questions involving the grant of a preliminary injunction are controlled by the law of the appropriate regional circuit.").

The parties dispute which of the Asserted Patents are raised in BTL's preliminary injunction motion. In its opening brief, BTL limited the allegedly infringed claims to: "9,636,519 (claims 1, 2, 3, 11); 10,478,634 (claims 1, 2, 6, 8); 10,598,386 (claim 12); 10,695,576 [sic, 10,695,575] (claims 1, 8); 11,266,852 (claim 9)" and contended the claim chart attached to its brief identified how Rejuva infringed upon each of these claims. ECF No. 100 at 9 (citing ECF No. 100-6). Rejuva argued in its opposition brief that the '852 patent was the only patent BTL asserted in its preliminary injunction motion. Defs.' Opposition to Pl.'s Motion for Preliminary Injunction, (ECF No. 105 at 6). In its reply, BTL again rested on the proposition that the claim chart it attached to its preliminary

injunction motion identified all of the aforementioned claims. ECF No. 107 at 2.

I find that BTL sufficiently raised only the '852 patent in its preliminary injunction motion for two reasons. First, BTL's claim chart contains only the elements of claim 9 of the '852 patent. *See* ECF Nos. 100-6, 100-7. In fact, the claim chart itself is titled "Analysis of Infringement by the Accused Devices of U.S. Patent No. 11,266,852." *Id.* Second, BTL's brief does not provide the Court with any argument on its likelihood of success on the merits regarding infringement for any of the Asserted Patents. BTL asserts only that the evidence attached to its preliminary injunction motion demonstrates that Rejuva infringed upon the Asserted Patents and does not articulate a developed argument on those claims. *See, e.g.*, *Asset Co IM Rest, LLC v. Katzoff*, No. 23 Civ. 9691, 2024 WL 167333, at *16 (S.D.N.Y. Jan. 16, 2024) ("Plaintiffs have not proffered sufficient evidence nor adequately developed an argument that would show a likelihood of success on the merits . . . ." (citing *N.Y.C. Env't Just. All. v. Giuliani*, 214 F.3d 65, 68 (2d Cir. 2000))); *see also Abdelrasoul v. Trs. of Bos. Univ.*, 734 F. Supp. 3d 168 (D. Mass. 2024) (declining to consider the plaintiff's likelihood of success because it did not proffer an argument to support its claims). Therefore, I will only address claim 9 of the '852 patent in assessing BTL's motion for a preliminary injunction.

BTL's preliminary injunction motion involves both patent and trademark claims. I will "give dominant effect to Federal Circuit precedent insofar as it reflects considerations specific to patent issues." *Macom Tech. Sols. Holdings, Inc. v. Infineon Techs. AG*, 881 F.3d 1323, 1328 (Fed. Cir. 2018) (quoting *Mikohn Gaming Corp. v. Acres Gaming, Inc.*, 165 F.3d 891, 894 (Fed. Cir. 1998)). In order to demonstrate a likelihood of success on the merits for patent infringement, BTL must show: (1) Rejuva infringed upon BTL's patented

technology, either directly or contributorily, with products Rejuva sold on its drop-shipping online shop, and (2) BTL's infringement claim is likely to withstand Rejuva's challenges to the validity and enforceability of BTL's patents. *See Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001). However, if Rejuva raises a "substantial question concerning either infringement or validity," that is, if Rejuva "asserts an infringement or invalidity defense that [BTL] cannot prove 'lacks substantial merit,' the preliminary injunction should not issue." *Id.* at 1350–51; *see also iRobot Corp. v. SharkNinja Operating LLC*, No. 19-cv-12125, 2019 WL 7578466 (D. Mass. Nov. 26, 2019).

I will assess BTL's trademark infringement claims under the law of the First Circuit. *See, e.g.*, *Bos. Duck Tours, LP v. Super Duck Tours, LLC*, 531 F.3d 1, 11–14 (1st Cir. 2008) (explaining First Circuit trademark law principles). To succeed on a claim of trademark infringement, BTL must establish "(1) that its mark[s are] entitled to trademark protection, and (2) that the allegedly infringing use is likely to cause consumer confusion." *Id.* at 11; *see also WEX Inc. v. HP Inc.*, No. 24-cv-00121, 2024 WL 3358651 at *17 (D. Me. July 9, 2024).

### A. Likelihood of Success of BTL's Patent Claims

#### i. Claim Construction

"It is elementary in patent law that, in determining whether a patent is valid and, if valid, infringed, the first step is to determine the meaning and scope of each claim in suit." *Lemelson v. Gen. Mills, Inc.*, 968 F.2d 1202, 1206 (Fed. Cir. 1992). Therefore, I begin with a claim construction analysis because "only when a claim is properly

9

understood can a determination be made whether the claim 'reads on' an accused device or method . . . ." *Amazon.com*, 239 F.3d at 1351. However, claim construction is not conclusive at the preliminary injunction stage and is subject to revision as the case develops. *See Sofamor Danek Grp., Inc. v. DePuy-Motech, Inc.*, 74 F.3d 1216, 1221 (Fed. Cir. 1996) ("[A] trial court has no obligation to interpret [a claim] conclusively and finally during a preliminary injunction proceeding.").

"Proper claim construction is informed by three sources: the claims, the specification, and the prosecution history." *Banjo Buddies, Inc. v. Renosky*, 160 F. Supp. 2d 138, 142 (D. Me. 2001) (citation omitted); *see also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) (citing *Markman v. Westview Instr.*, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996)). The disputed claim terms need only be construed sufficiently to resolve the particular issue in the matter at hand. *E.g.*, *Vivid Techs., Inc. v. Am. Science & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999). Claim terms are given their ordinary and customary meaning to a person of skill in the art at the time of the invention ("POSITA"). *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005); *see also Printguard, Inc. v. Anti-Marking Sys., Inc.*, 535 F. Supp. 2d 189, 197 (D. Mass. 2008). A court may not use extrinsic evidence to contradict claim meanings that are unambiguous in light of the intrinsic evidence. *See Phillips*, 415 F.3d at 1322−23.

The issue here is the meaning attributed to the term "configured to" in the relevant portions of the '852 patent:

9. A treatment device for enhancing a visual appearance of a patient, the treatment device comprising:

[A] first magnetic field generating coil and a second magnetic field

generating coil . . .

wherein *the first magnetic field generating coil is configured to generate a first time-varying magnetic field* with a repetition rate in a range of 1 Hz to 300 Hz and a magnetic flux density in a range of 0.1 Tesla to 7 Tesla on a surface of the first magnetic field generating coil,

. . . wherein *the first magnetic field generating coil is configured to generate the first time-varying magnetic field* independently of the second time-varying magnetic field,

wherein each of the first and the second magnetic field generating coils is *configured to* generate a plurality of pulses,

. . . wherein the *first and the second magnetic field generating coils are configured to be placed proximate to a body region of the patient* such that the first and the second time-varying magnetic fields are each applied to the body region to cause a contraction of at least one muscle in the body region to enhance the visual appearance of the patient . . . .

U.S. Patent No. 11,266,852 (issued Mar. 8, 2022), cols. 113–14 (emphasis added), (ECF No. 57-1). Specifically, the parties disagree on whether the meaning of the term "configured to" is more akin to BTL's interpretation of "designed to" or Rejuva's interpretation of "set up to". According to Rejuva's construction of the term, infringement occurs only if an end-user "sets up" the Accused Devices to operate under the parameters of claim 9 of the '852 patent. Therefore, as a drop-shipper, Rejuva contends it cannot be liable for direct infringement because it does not obtain possession of the Accused Devices to configure or "set up" the devices within the parameters of claim 9. Rejuva also contends it cannot be liable for induced infringement since BTL cannot prove an end-user operated the Accused Devices within the limitation of claim 9 of the '852 patent (the claimed frequency and Tesla parameters).

BTL's use of "configured to" suggests a meaning more akin to "designed to" or "adapted to". In *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, the Federal Circuit

interpreted the patentee's use of "adapted to" to mean the invention was "designed or configured to accomplish the specified objective." 672 F.3d 1335, 1348–49 (Fed. Cir. 2012). There, the court held the natural understanding of the term, along with intrinsic evidence of the patent—such as the specification explaining the "magnetic members of the auxiliary frame as being 'for engaging' with the magnetic members of the primary frame"—supported a meaning of "designed to or configured to," which BTL posits for the proposition that the terms are synonyms. *Id.*; *see also Sta-Rite Indus., LLC v. ITT Corp.*, 682 F. Supp. 2d 738, 753 (E.D. Tex. 2010) (holding, in context, the meaning of "adapted to" is more akin to "designed or configured to," not "having the capacity to").

Here, similar to the device in *Aspex Eyewear*, claim 9 of the '852 patent refers to the first and second magnetic field generating coil as "configured to generate a first time-varying magnetic field with a repetition rate in a range of 1 Hz to 300 Hz . . . ." '852 patent, col. 113, ll. 60–67. This expression suggests the device was designed (in the past) to achieve the claimed function, not that it may be set up (in the future) to do so. Moreover, the '852 patent's specification also uses "set up" to explain that, in operating the device, "a magnetic flux density may be *set up* as highest magnetic flux density value acceptable by the patient." '852 patent, col. 25, ll. 62–64 (emphasis added). Different words in different portions of a patent's specification are presumed to have different meanings. *See generally Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998). Therefore, the use of "set up" in the description suggests that the device is designed to achieve the claimed function and its operational parameters may be adjusted, or "set up" differently, when applying the device to different patients (but still within the claimed function). Thus, for the purposes of this preliminary injunction, I will construe the term

12

"configured to" in claim 9 to be synonymous with "designed to" or "adapted to".

### ii. Burden of Proof for Rejuva's Invalidity Challenge

The parties disagree as to the appropriate standard of proof Rejuva must meet in challenging a patent's validity. Issued patents come with a statutory presumption of validity under 35 U.S.C. § 282. *See BlephEx, LLC v. Myco Indus., Inc.*, 24 F.4th 1391, 1399 (Fed. Cir. 2022). As such, it is the alleged infringer's burden to bring evidence of any claimed invalidity forward. *E.g.*, *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1377 (Fed. Cir. 2009). The Court "does not resolve validity [at the preliminary injunction stage], but rather must . . . make an assessment of the persuasiveness of the challenger's evidence, recognizing that it is doing so without all evidence that may come out at trial." *Id.* "The relevant inquiry is therefore whether the patentee has shown it is more likely than not to prevail over an invalidity challenge." *Natera, Inc. v. NeoGenomics Lab'ys, Inc.*, 106 F.4th 1369, 1377 (Fed. Cir. 2024).

BTL argues Rejuva is required, and unable, to prove an invalidity defense by clear and convincing evidence. Rejuva argues that as the accused infringer it need only raise a *substantial question* of patent's validity to defeat BTL's likelihood of success on the merits and prevent a preliminary injunction.

The Federal Circuit resolved this question in *Titan Tire Corp*:

> When analyzing the likelihood of success factor, the trial court, after considering all the evidence available at this early stage of the litigation, must determine *whether it is more likely than not* that the challenger will be able to prove *at trial*, by clear and convincing evidence, that the patent is invalid.

*Titan Tire Corp.*, 566 F.3d at 1379 (emphasis added). "[T]he 'clear and convincing' standard regarding the challenger's evidence applies only at trial on the merits . . . ." *Id.* at 1379–80. Moreover,

> [t]he persuasive evidence necessary at the preliminary injunction stage is something less than the clear and convincing evidence necessary to establish invalidity at trial. If the [alleged] infringer does come forward with persuasive evidence of invalidity, then the preliminary injunction should not be granted unless the patentee can show that the invalidity defense "lacks substantial merit," for example, by "showing that the patent in suit had successfully withstood previous validity challenges in other proceedings," or "a long period of industry acquiescence in the patent's validity."

*Banjo Buddies*, 160 F. Supp. 2d at 144 (quoting *Amazon.com,* 239 F.3d at 1350–51, 1359.) "In short, the patentee must show that its patent is likely to withstand the challenges to its validity." *Id.*

### iii. Indefiniteness[2]

The parties dispute whether claim 9 of '852 patent is sufficiently definite under 35 U.S.C. § 112, which outlines the substantive requirements for patent claims. A patent claim is invalid for indefiniteness if, "read in light of the specification delineating the patent, and the prosecution history," the claim fails to inform a POSITA on the scope of the invention with reasonable certainty. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014); *see also* 35 U.S.C. § 112. The challenged portion of claim 9 of the '852 patent states: "A treatment device for enhancing the visual appearance of a patient . . . ." '852 patent, col. 113, (ECF No. 57-1). The crux of the issue is whether the

---

[2] BTL's preliminary injunction motion alone does not contain substantive arguments on definiteness regarding claim 9 of the '852 patent. As such, I draw the majority of BTL's position in this section from its Claim Construction Brief (ECF No. 58). *See, e.g*., *Sterling v. Deutsche Bank Nat'l Tr. Co. as Trs. for Femit Tr. 2006-FF6*, 368 F. Supp. 3d 723, 725, n.2 (S.D.N.Y. 2019) ("In deciding a motion for preliminary injunction, a court may consider the entire record including affidavits and other hearsay evidence.").

'852 patent's specification provide a POSITA with a sufficient objective basis to determine the meaning of "enhance[e] the visual appearance of a patient." *Id.*

According to BTL, a POSITA would recognize claim 9 is a predictable process that can be accomplished by applying the electromagnetic fields to the patient's body. Electromagnetic body contouring technology is a predictable art premised on the fact that applying electromagnetic fields to the muscles causes contractions that result in an enhancement to the visual appearance of a patient. Said enhancements occur regardless of the degree of the contractions, thus claim 9 does not require a particular measure to determine when the patient's enhanced appearance has resulted from application of the device. BTL further asserts that, under *Nevro Corp. v. Boston Sci. Corp.*, the only relevant determination for definiteness under § 112 is whether the specification provides "a general guideline and examples" that inform a POSITA of the claim's scope. 955 F.3d 35 (Fed. Cir. 2020). In *Nevro*, the Federal Circuit explained that the district court applied the wrong test to determine indefiniteness when it focused on ambiguity with respect to identifying an infringing use of the device. *Id.* at 39 ("The test for indefiniteness is not whether infringement of the claim must be determined on a case-by-case basis. Instead, it is simply whether a claim 'inform[s] those skilled in the art about the scope of the invention with reasonable certainty.'" (quoting *Nautilus*, 572 U.S. at 910)). The Federal Circuit ultimately held that because a POSITA would be able to determine whether the signal created a "paresthesia-free" effect on a patient, the at-issue claims did not render the device indefinite. *Id.* at 40.

BTL further emphasizes that a lack of an objective baseline to measure the scope of a term renders a patent indefinite, not the use of a subjective term itself. BTL supports

its position with the *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.* decision, 30 F.4th 1339, 1347–50 (Fed. Cir. 2022) (finding the patent's intrinsic and extrinsic evidence was sufficient to dispel the challenger's claim of indefiniteness), arguing claim 9 of the '852 patent is more akin to claims the Federal Circuit has previously held are sufficiently definite, *see Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017), as opposed to claims the Federal Circuit has invalidated for failure to provide sufficient guidance of the claim's scope with any objective boundaries, *see Datamize LLC v. Plumtree Software, Inc.*, 417 F.3d 1342 (Fed. Cir. 2005). BTL argues the intrinsic evidence in the '852 patent demonstrates a clear objective standard that allows a POSITA to reasonably determine that the scope of "enhanced the visual appearance of a patient" equates to "shaping, toning, and/or 'volumization' effect" as a result of the muscle contracting." Pl.'s Claim Construction Brief, (ECF No. 58 at 17).

On the other hand, Rejuva asserts that a POSITA cannot determine with reasonable certainty either the meaning of claim 9 or when a user's appearance has been sufficiently enhanced. Rejuva cites to *Datamize,* where the court applied the "insolubly ambiguous" test in determining a software patent that allowed people to customize user interfaces for electronic kiosks was indefinite. 417 F.3d at 1347. In *Datamize*, the court explained the patentee's use of "aesthetically pleasing" did not meet the standard for definiteness because the terms were completely dependent on a person's subjective opinion and the inventor did not provide a workable objective standard to determine the scope of the claimed invention. *Id.* at 1350. Rejuva also cites *Niazi*, asserting the inverse of BTL's proposition that the '852 patent's specification provides sufficient objective parameters to determine the scope of claim 9. 30 F.4th at 1348. Rejuva argues the '852

patent's specification does not provide a sufficient objective basis to determine how much of a reduction of adipocytes/fat tissue enhances the visual appearance of patient. Rejuva further states that, due to varying sizes of patients and the lack of objective standards, such as an amount of time to use the device or other application parameters, the '852 patent's specification fails to inform with reasonable certainty the amount of muscle contractions required to enhance a patient's visual appearance.

I conclude for purposes of this motion that Rejuva has raised a substantial question on indefiniteness and that BTL has failed to carry its burden by showing that Rejuva's invalidity defense lacks substantial merit. *See Titan Tire Corp.*, 566 F.3d at 1376 (the Court "does not resolve the validity question [at the preliminary injunction stage] but rather must . . . make an assessment of the persuasiveness of the challenger's argument" (quoting *New England Braiding Co. v. A.W. Chesterton Co.*, 970 F.2d 878, 882–83 (Fed. Cir. 1992)) (alteration in original)); *see also Abbott Lab'ys v. Andrx Pharms., Inc.*, 452 F.3d 1331, 1335 n.2 (Fed. Cir. 2006). Rejuva's invalidity challenge requires me to delve deeply into whether the '852 patent's specification sufficiently outlines objective parameters that enables a POSITA to understand the scope of the invention with reasonable certainty. *Nevro*, 955 F.3d at 41 (citing *Nautilus,* 572 U.S. at 910); *see also Printguard,* 535 F. Supp. at 196 ("Under *Genentech*, a preliminary injunction should not issue if the defendant raises a "substantial question" concerning the validity of the patent—even if the Court were to conclude that the moving party is more likely to succeed on that issue." (quoting *Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1364 (Fed. Cir. 1997)). BTL's position alone does not convince me to determine that claim 9 of the '852 patent is sufficiently definite in accordance with § 112. Moreover, both parties submit

17

evidentiary support, including contradicting declarations from qualified experts on this issue. *Cf. Natera, Inc. v. NeoGenomics Lab'ys*, Inc., 106 F.4th 1369, 1377 (Fed. Cir. 2024) (in rejecting the challenger's invalidity argument, the court found the defendant presented minimal argument and no meaningful evidence to support its invalidity position). Therefore, I will not grant a preliminary injunction against Rejuva for the '852 patent.

### B. Likelihood of Success of BTL's Trademark Claims

"To succeed on a claim of trademark infringement, a plaintiff must establish (1) that its mark[s are] entitled to trademark protection, and (2) that the allegedly infringing use is likely to cause consumer confusion." *Bos. Duck Tours, LP v. Super Duck Tours, LLC*, 531 F.3d 1, 12 (1st Cir. 2008). The First Circuit understands "'likely confusion' to mean 'more than the theoretical possibility of confusion.'" *Id*. There is no dispute over whether BTL's marks are entitled to trademark protections. Thus, the focus here is on the second factor, the likelihood of consumer confusion.

To determine the likelihood of consumer confusion, the First Circuit employs the eight-factor *Pignons* test. *See Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 487 (1st Cir. 1981); *see also Bos. Duck Tours*., 531 F.3d at 15. These factors are:

> (1) the similarity of the marks; (2) the similarity of the goods; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's intent in adopting its mark; and (8) the strength of the plaintiff's mark.

*Borinquen Biscuit Corp. v. M.V. Trading Corp.*, 443 F.3d 112, 120 (1st Cir. 2006) (quoting *Astra Pharm. Prods., Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1205 (1st Cir.

1983)). "A proper analysis takes cognizance of all eight factors but assigns no single factor dispositive weight." *Id.* I examine the *Pignons* factors in turn with respect to BTL's EM-2 mark.[3] The marks to be compared are as follows:



### i. Similarity of the Marks

The Court considers the sight, sound, and similarity of the two marks at issue to evaluate the first *Pignons* factor. *Bos. Duck Tours.*, 531 F.3d at 24. Context of how the marks are used governs the similarity analysis. *Oriental Fin. Grp., Inc. v. Cooperativa de Ahorro y Credito Oriental*, 832 F.3d 15, 34 (1st Cir. 2016).

Here, BTL's devices are labeled with the stylized EM-2 mark. Similarly, Rejuva markets the Accused Devices with the stylized prefix "EM". Thus, the marks are similar visually due to the appearance of the "EM" prefix. The marks are also used in similar context—both parties use the mark to denote electromagnetic body sculpting technology. On the other hand, each parties' use of the mark is followed by a different suffix. In the example BTL provides, BTL's uses "EMSCULPT" while Rejuva uses "EMSZERO". *See* ECF No. 100 at 17.

---

[3] Like the '852 patent, BTL only provides an argument with respect to the EM-2 mark. *See* ECF No. 100 at 17—18. Thus, the EM-2 mark is the only mark I will address at this stage.

Considering these factors together, the similarity of the marks and the context in which they appear weigh in favor of finding that consumer confusion is likely to occur. Because the "EM" mark appears on electromagnetic body-sculpting technology that BTL developed, and Rejuva attaches the same "EM" mark with a suffix also beginning with "S" to the Accused Devices, a reasonable viewer could confuse the products sold by both parties.

### ii. Similarity of the Goods

Both parties' devices involve electromagnetic body sculpting technology. Thus, this factor weighs in favor of finding confusion.

### iii. Channels of Trade, Advertising, and Prospective Purchasers

"Factors three (channels of trade), four (advertising), and five (classes of prospective purchasers) are often considered together because they tend to be interrelated." *Beacon Mut. Ins. Co. v. OneBeacon Ins. Grp.*, 376 F.3d 8, 19 (1st Cir. 2004). "Channels of trade refer to the distribution methods and markets in which the products are sold." *Plixer Int'l, Inc. v. Scrutinizer GMBH*, No. 16-cv-578, 2020 WL 2114923, at *5 (D. Me. May 4, 2020) (quoting *Butcher Co., Inc. v. Bouthot*, 124 F. Supp. 2d 750, 756–57 (D. Me. 2001)).

The parties' distribution methods are not identical. BTL accepts orders and ships its products directly to customers. Rejuva accepts orders via Shopify and places orders with a third-party vendor that ships the devices to Rejuva's customers. The fact that both parties have an online shop is insufficient, alone, to demonstrate confusion in the market. *See WEX Inc.*, 2024 WL 3358651, at *23 ("The fact that both companies have an online presence is not likely to cause confusion . . . ."). As such, in the absence of further factual

development, the channels of trade analysis alone may slightly lean towards Rejuva at this stage.

However, both parties market their products to prospective customers in the aesthetics industry, particularly in the United States. These purchaser-entities typically include spas and similar businesses involved with cosmetic enhancements. The parties do not indicate a limitation on the entities they advertise their products to. Thus, because the parties' advertising and prospective customers overlap, these two factors together weigh in favor of finding confusion.

### iv. Actual Confusion

"[E]vidence of actual confusion is often deemed the best evidence of possible future confusion." *Borinquen Biscuit*, 443 F.3d at 120. Nonetheless, BTL's burden here is to show likelihood of confusion, not actual confusion. *See id.*

BTL submitted evidence of one customer actually confusing Rejuva's device with a BTL device. *See* ECF No. 101-6 (Ex. 15). A displeased customer from the United States contacted Rejuva to resolve some issues with a device the customer purchased. Dissatisfied with Rejuva's responses, the customer contacted BTL directly to inquire about a solution to fixing the device. The customer learned from BTL's response that the product was not a BTL device. The customer stated further that they were "trying to figure who actually makes the machine." Ex. 15 at 2. Although Rejuva asserts this evidence is not persuasive because the customer did not state explicitly that they had purchased the product from Rejuva under the belief that it was a BTL device, the fact that the customer reached out directly to BTL to resolve issues with the device and asked BTL to clarify if it created the product clearly indicates at least one instance of actual confusion in the United

States. *Id.*; *cf. Plixer Int'l*, 2020 WL 2114923, at *7–*8 (finding contrary to evidence presented that the plaintiff had no evidence of actual confusion in the United States). In sum, I find this factor weighs in favor of finding a likelihood of confusion.

### v. Rejuva's Intent

With respect to intent, the question is whether Rejuva "decided to use the mark . . . in order to cause market confusion or with an intent to exploit [BTL's] reputation and goodwill." *Dorpan, S.L. v. Hotel Meliá, Inc.*, 728 F.3d 55, 68 (1st Cir. 2013). "This factor only affects the overall analysis if there is evidence the defendant acted in bad faith." *Plixer Int'l*, 2020 WL 2114923, at *6. Because a lack of bad faith "is not particularly useful in the ultimate determination of likelihood of confusion and may not outweigh other factors that suggest a likelihood of confusion" and there is no evidence of bad faith here, this factor does not affect the *Pignons* analysis. *Dorpan*, 728 F.3d at 69.

### vi. Mark Strength

The Court "typically evaluate[s] a mark's strength primarily on the basis of its commercial strength, analyzing such factors as the length of time a mark has been used and the relative renown in its field; the strength of the mark in plaintiff's field of business; and the plaintiff's action in promoting the mark." *Id.* at 68 (citation and internal quotation marks omitted).

While neither party provides an argument on the strength of BTL's trademarks, I will provide a cursory assessment on this issue. BTL began using its marks in commerce in 2017 to denote its novel electromagnetic body sculpting technology. BTL uses the marks to identify its products and to reassure patients that users of the devices are

22

authorized and trained by BTL. Also, BTL was successful in obtaining federal registration of its trademarks. Nothing indicates another third party uses similar marks on its products. *See A. Simon & Sons, Inc. v. Simonfurniture Int'l, Inc.*, No. 21-cv-11254, 2021 WL 6144611 at *8 (D. Mass. Nov. 19, 2021) ("Evidence of third-party use of similar marks on similar goods can be probative of a mark's relative weakness."). Therefore, this factor weighs in favor of finding a likelihood of confusion.

### vii. Balancing the *Pignons* Factors

After individual assessment of the *Pignons* Factors, I must weigh the factors to determine whether BTL has demonstrated a likelihood of consumer confusion. *See Borinquen Biscuit*, 443 F.3d at 120 ("A proper analysis takes cognizance of all eight factors but assigns no single factor dispositive weight."). As a result, I find confusion is likely in this matter.

Factors one, two, four, five, six, and eight weigh in favor of finding confusion. Four of these factors are considered to be the "most critical" in determining a likelihood of confusion. *See Beacon Mut.*, 376 F.3d at 20 ("[T]he most critical factors [are] evidence of actual confusion, similarity of marks, similarity of goods and services, and strength of marks."). Together, these factors demonstrate that Rejuva's use of the "EM" mark is likely to cause consumer confusion due to the similarity in the products and the market in which the products are sold. Further, the only factor that led to a contrary conclusion is factor three. Viewed together, the evidence favors a finding of confusion between the parties' devices, and BTL is likely to succeed in its trademark infringement claim.

### C. Irreparable Harm

Irreparable harm is "an injury that cannot adequately be compensated for either

23

by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy," *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005), and it is "an essential prerequisite for a grant of injunctive relief," *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 13 (1st Cir. 2000).

The Trademark Modernization Act (TMA) creates a rebuttable presumption of irreparable harm where a plaintiff has demonstrated a likelihood of success on its trademark infringement claim. 15 U.S.C. § 1116(a). Although the First Circuit has not addressed the mechanics of applying this rebuttable presumption, this Court has previously followed the Third Circuit in shifting the burden of production to the defendant after a plaintiff establishes a likelihood of success to allow the defendant "to introduce evidence sufficient for a reasonable factfinder to conclude that the consumer confusion is unlikely to cause irreparable harm." *WEX Inc.*, 2024 WL 3358651, at *31 (quoting *Nichino Am., Inc. v. Valent U.S.A. LLC*, 44 F.4th 180, 186 (3d Cir. 2022)). "If a defendant successfully rebuts the TMA's presumption by making this slight evidentiary showing, the presumption has no further effect," and "the burden of production returns to the plaintiff to point to evidence that irreparable harm is likely absent an injunction." *Id.*

I do not find irreparable harm here for three reasons. First, BTL moves to enjoin Rejuva from using the alleged infringing marks nearly two years after filing suit, claiming that Rejuva is a foreign entity and that Ms. Jacobs commingles the business's funds with her own personal funds. Rejuva is correct that "any presumption of irreparable harm that may arise upon a finding of likelihood of success on the merits of a trademark infringement claim 'is inoperative if the plaintiff has delayed either in bringing suit or in moving for preliminary injunctive relief.'" *Voice of the Arab World, Inc. v. MDTV Med.*

24

*News Now, Inc.*, 645 F.3d 26, 35 (1st Cir. 2011) (quoting *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995)). Thus, BTL's delay in moving for a preliminary injunction weighs against issuing one in this matter.

Second, BTL cites to an abundance of nonbinding authority to support its assertion that Ms. Jacobs's geographic location permits me to issue the injunction. BTL asserts there is a general consensus among the courts that a foreign defendant with no assets in the United States supports a finding of a likelihood of irreparable harm. As this Court is considering the risk of irreparable harm with respect to trademark infringement, as opposed to patent infringement, the Federal Circuit decisions are less persuasive than in the patent context. *See Nitro Leisure Prods., L.L.C. v. Acushnet Co.*, 341 F.3d 1356, 1359 (Fed. Cir. 2003) ("[The Federal Circuit] defer[s] to the law of the regional circuit when addressing substantive legal issues over which [it] do[es] not have exclusive subject matter jurisdiction."); *see also* 28 U.S.C. § 1295(a)(1). Moreover, the cases BTL cites can be distinguished from this matter by the fact that Ms. Jacobs is a citizen of the United States, Rejuva Fresh is incorporated in the state of Maine, and both entities have U.S. bank accounts with Bank of America.

Lastly, I find no merit in BTL's unsubstantiated allegation that Rejuva will move its U.S. assets to an unrecoverable, foreign bank account upon a judgment in BTL's favor. BTL premised these allegations on facts revealing Ms. Jacobs transferred funds from Rejuva's business account to her personal account. However, the evidence Rejuva submitted demonstrates Ms. Jacobs made the transfer to satisfy her 2023 U.S. tax debt, which the Internal Revenue Service has collected from Ms. Jacobs. *See* ECF No. 105-28. Therefore, Rejuva has successfully rebutted the presumption of irreparable harm, and

BTL does not put forth any evidence that sways me back in its favor. Accordingly, the preliminary injunction will not issue, and I need not make further inquiry.

## CONCLUSION

For the foregoing reasons, Plaintiff BTL's motion for a preliminary injunction (ECF No. 100) and motion to strike (ECF No. 109) are **DENIED**.

**SO ORDERED.**

Dated this 7th day of May, 2025.

/s/ Stacey D. Neumann
UNITED STATES DISTRICT JUDGE